William L. Boyd, Executor, etc., Respondent, v. John De La Montagnie, Appellant.

A gratuitous transfer of property from a wife to a husband, induced in part by representations on his part that she was liable for a debt, for which in fact she was not liable, and made in the belief that the effect of the transfer would be to delay the creditors or in some way to save the property, will be set aside by a court of equity.

To sustain an action for that purpose it is not necessary to show a fraudulent intent upon the part of the husband in making the representations; a mutual misapprehension or mistake is sufficient.

From the confidential relations of the parties the burden is thrown upon the husband, in order to sustain such a transfer to show that the gift was freely and deliberately made, and that the transaction was fair and proper.

The fact that the wife consented to the transfer to defraud creditors does not constitute a defense.

Where the wife is thus induced by untrue statements, and acting under a misapprehension, to make the transfer at the time, when but for such misapprehension she would not then have made it, her legal right to a retransfer is not impaired by the fact that she intended to give the property to her husband by will.

(Argued April 15, 1878; decided May 21, 1878.)

Appeal from judgment of the General Term of the Supreme Court, in the first judicial department, affirming a judgment in favor of plaintiff entered upon a decision of the court on trial at Special Term.

This action was brought to set aside a transfer of what is known as "a sailors' snug harbor lease," made by Caroline C. De La Montagnie, plaintiff's testatrix, to a third person, and by him to her husband the defendant.

The facts appear sufficiently in the opinion.

*A. Oakey Hall*, for appellant.

*M. W. Divine*, for respondent. Plaintiff's intestate having transferred the property in suit under an entire misapprehension, and on the faith of false statements made to her

by her husband he could not keep it. (1 Taylor on Ev. [6th ed.], § 129; *Whelan* v. *Whelan*, 3 Cow., 537, 576, 577; *Gee* v. *Spencer*, 1 Vern., 32; *Young* v. *Peachy*, 2 Atk., 255; Willard's Eq. Ju., 169, 170; *Sears* v. *Shafer*, 2 Seld., 272; S. C., 1 Barb., 408–414; 1 Story Eq. Ju., §§ 140, 147, 187, 218, 307, 308; *Jacques* v. *Methodist Ch.*, 17 J. R., 548; *Fry* v. *Fry*, 7 Paige, 461; *Grigby* v. *Cox*, 1 Ves. Sr., 517; *Cooke* v. *Lamotte*, 15 Beav., 234, 239, 241; *Summers* v. *Griffiths*, 35 id., 27; *Baker* v. *Monk*, 33 id., 419; *Hoghton* v. *Hoghton*, 15 id., 278; *Ford* v. *Harrington*, 16 N. Y., 285; *Davies* v. *Davies*, 2 New Rep., 384; *Coults* v. *Ackworth*, E. L. R. [8 Eq.], 558–567; *Gibson* v. *Jeyes*, 6 Ves., 266, 276.) It would not be an answer to plaintiff's claim that the transfer was made in fraud of creditors. (*Freelove* v. *Cole*, 41 Barb., 318; affirmed, 41 N. Y., 285; *Ford* v. *Harrington*, 16 N. Y., 285; *Osborne* v. *Williams*, 18 Ves., 379.) The intentions of the parties were a subject of legitimate inquiry. (*Tracy* v. *McManus*, 58 N. Y., 257; *Bedell* v. *Chase*, 34 id., 386; *Forbes* v. *Waller*, 25 id., 439; 2 N. Y. Supreme Ct. Reps. [T. & C.], p. 25.)

CHURCH, Ch. J. The trial judge found that certain shares in the steamer Gold Hunter were purchased by the defendant, in California, in his own name and on his own account, although it appears that the title was taken in the name of Mrs. De La Montagnie, the plaintiff's testatrix. He also found that the adventure proved a failure, and that a considerable amount of debts existed against the steamer for which the owners were liable, but that Mrs. De La Montagnie was not, and the defendant was liable for said debts. He further found that the defendant exhibited to the testatrix a letter from his brother in California stating that an attempt would be made by the creditors to collect their claims against the steamer from her, and that the defendant also expressed the opinion or apprehension that she and her property were liable to pay the debts of the *Gold Hunter;* that Mrs. De La Montagnie believed that she and her property were liable to pay said debts,

and that if she assigned the lease it would be more secure than in her hands, and might at least delay the creditors; that she assigned the lease in September, 1851, to a mutual friend, who immediately assigned it to the defendant; that her belief that she was liable for the said debts "entered into and operated upon her mind as to the date of carrying into effect her intention to make said transfer." The judge also found that afterwards, in 1860, the defendant, upon request to retransfer said lease, promised to do so, but said he would take his own time for it, and that he never did retransfer it. He further found that there was no consideration for the transfer. The original lease expired in 1852. A renewal thereof was granted to defendant for twenty-one years, and, in 1873, it was again renewed. The basis of the action is that the plaintiff's testatrix was induced to believe from the statements and representations of the defendant that she was liable for the debts of the Gold Hunter, and under the influence of that belief, in whole or in part, she transferred the lease in question to the defendant, supposing that the effect would be to delay the creditors, or in some way save her property from liability. She was not liable for the debts, and acted under a misapprehension or mistake.

I have examined all the evidence with care, and although there is room for contrary inferences, I have arrived at the conclusion that the findings were warranted, and hence that this court has no power to review them. The rule is well-settled that this court cannot review the findings of fact of a judge or referee, if the evidence is fairly capable of a construction which justifies them. The Special and General Terms may pass upon facts, this court cannot. The degree of credit to be given to the witnesses and the inferences to be drawn from facts proved are peculiarly the province of the courts below to determine, and when so determined the duty of this court is confined to a review of the legal conclusions drawn from such facts.

There are some grounds for the position that the real motive for the transfer was love and affection, and that the

act was consummated in pursuance of a previous intention, and that the Gold Hunter transaction only furnished a pretext or excuse to be used among fault finding relatives, but there is evidence from which a contrary inference may be drawn.    The provision in the will previously executed was quite different from a present transfer, because the wife would remain in control and in receipt of rents and profits, and it would be subject to revocation, change or alteration, during her life.    So a purpose that at some time she would make the transfer is indefinite and liable to change.    It is a circumstance of some significance that when the transfer was made, she expressly repudiated " love and affection " as a consideration, and directed that the nominal sum of one dollar be inserted.

The evidence of the defendant is to some extent corroborative of that of the testatrix as to conversations in respect to the claims of the creditors of the Gold Hunter, and her liability for them, and the learned counsel for the defendant frankly concedes in his brief that, " there is no doubt from the evidence of both the husband and the wife that these claims    *    *    *    had been the subject of conversation, *and constituted an element for selecting* a date of transfer under the motive of affection."    This reduces the pivotal fact to a very fine point, viz.: Whether the facts were so plain that the court below could not avoid discovering that behind the admitted reason for making the transfer *at that time* was the controlling motive of love and affection.    If she was induced by untrue statements of the defendant, and acting under a misapprehension as to her liability, to make the absolute transfer at that time, when but for such misapprehension she would not then have made it the legal right to a retransfer, would not be impaired by the fact that she intended to give it by will.    She was entitled to be restored to the condition from which she was induced to depart by the untrue statements of her husband.

The learned counsel for the defendant insists that upon all questions of conflict between the parties, the evidence of the

mutual friend should have been controlling with the court below. This court might so think, and yet it was a question for the court below to decide with which we cannot interfere. But the findings are consistent with the perfect integrity as a witness of the mutual friend. The motive of love and affection was made more prominent in conversation with him than when the parties were alone. The motive of a transfer to defraud creditors would be if possible ignored in the presence of a lawyer, and one less obnoxious to moral and legal criticism adopted. It is probable that the recollection of the mutual friend was more accurate than either of the parties as to dates and order of events if not as to the events themselves, but this might not materially affect the question whether the wife acted under a false impression produced by the husband. It is also probable that conversations and acts which took place long subsequent to the transfer were, to some extent, intermingled with those which occurred before, but it is not clear how far this was done, nor what influence it should have upon the result. It must suffice for us that the findings are supported by evidence and hence are conclusive.

It is not found that the defendant acted with a fraudulent intent in procuring the transfer, but I do not understand that this is necessary to be affirmatively shown in this class of cases. A court of equity will interpose its jurisdiction to set aside instruments between persons occupying relations in which one party may naturally exercise an influence over the conduct of another. A husband occupies such a relation to the wife, and the equitable principles referred to would apply to them in respect to gratuitous transfers by the wife to the husband, however it might be in ordinary business transactions, which the wife may legally engage in. When this relation exists the person obtaining the benefit must show, by the clearest evidence, that the gift was freely and deliberately made. The burden is upon the person taking the gift to show that the transaction was fair and proper. (*Sears* v. *Shafer*, 6 N. Y., 268 ; *Hoghton* v. *Hoghton*, 15 Beav., 278; *Ford* v. *Harrington*, 16 N. Y., 285; 2 New Rep., 384;

*Coutts* v. *Acworth*, L. R., 8 Eq., 558–567; *Burnaby* v. *Griffin*, 3 Vesey, 266.)

STORY says : " Hence, the law, with a wise providence, not only watches over all the transactions of parties in this predicament, but it often interposes to declare transactions void, which, between other persons, would not be held objectionable. It does not so much consider the bearing or hardship of its doctrine, upon particular cases, as it does the importance of preventing a general public mischief, which may be brought about by means, secret and inaccessible, to judicial scrutiny, from the dangerous influences arising from the confidential relation of the parties." (Story's Eq. Jur., 310.) A misapprehension of a party may be sufficient. (*Gee* v. *Spencer*, 2 Ves., 401, and note.) Lord ELDON, in *Huguenin* v. *Baseley*, 14 Vesey, 273, says, that " when the decision rests upon the ground of public utility, for the purpose of maintaining the principle, it is necessary to impute knowledge which the party may not actually have had."

Nor is it an answer that the wife consented to the transaction to defraud creditors. The parties do not stand on equal terms, and the husband cannot avail himself of the plea of *particeps criminis* on the part of the wife. (*Freelove* v. *Cole*, 41 Barbour, 318; affirmed, 41 N. Y., 619; *Osborne* v. *Williams*, 18 Vesey, 379.) But assuming what I think is the real fact, that the defendant believed that his statement that the wife was liable for the claims against the Gold Hunter was true, it follows that the parties acted under a mutual mistake, and even if it be regarded a mistake in law, it is one, I apprehend, which courts of equity will relieve against, especially between parties thus situated. (Story's Eq., § 138.) And if we go a step farther in favor of the defendant's good faith (and the evidence justifies it), and assume that he supposed the transfer was really made from motives of love and affection, yet, if the wife, though entertaining a sufficient affectionate regard for him to have made the transfer, was, in fact, induced to do it under the supposition of the liability, and would not have done it other-

wise, and this belief was produced by the untrue statements of the defendant, although he may have believed them true, within the principles above referred to, I think she is entitled to relief.

There is no direct finding upon the question of ratification, and if we should refer to the evidence, which we never do, to reverse a judgment, it would be found entirely insufficient to establish, conclusively, that after a full knowledge of his position she intended to confirm and ratify the transfer. Her acquiescence in the renewal of the lease by the defendant, and the reason given, is as consistent with her version of the original transaction, and the continuance of the title in the husband for the original purpose, as it is with an intention to permanently bestow the property upon him. It is found that the defendant, in 1860, agreed to retransfer the lease, but stated that he would take his own time for it. The letters furnish no decisive evidence inconsistent with her right, although the omission in them of any request for a retransfer, or allusion to it, tends to show an acquiescence, but it is not conclusive. The parties have not lived together as husband and wife since 1860, when the defendant went a second time to California. Soon after his return he went into the army, and then to Europe, where he has since remained, in the consular service of the government. A large number of letters of the wife were produced on the trial to show the amicable relations existing between the parties down to the commencement of this suit, and considerable stress is laid upon the fact to corroborate the defendant's claim, as to the nature of the transaction, and the wife's intention to ratify the transfer. The precise relation between the parties is not very clear. There certainly was never any outspoken quarrel. They were both cultivated and refined, and their communications were high-toned, and in every respect unobjectionable. There is in one or two of the wife's letters a delicate suggestion indicative of jealousy, but accompanied by a disclaimer that jealousy was harbored, and the general tone and character of those written during the first few

years are quite different from those written in later years. Although the latter are far from fault finding, yet the characteristics of the letters changed from profuse expressions of marital affection to common-place civility and formal politeness. Precisely what this indicates it is not needful to surmise ; but a result adverse to perfect marital cordiality might naturally be expected from a marriage of an ambitious young man to a lady twenty years his senior, however accomplished and worthy she might be, and the letters, I think, tend to show that at some period there was a certain degree of coolness at least between them.

I have examined the several requests to find facts and law which were refused, and no substantial error was committed. They are either requests to find evidence, which if found would not change the result, or they are requests to find facts in respect to which there was conflict of evidence, or to find conclusions of law which were in conflict with those which had been found.

The judgment must be affirmed.

All concur.

Judgment affirmed.